767 S.E.2d 471

STATE of West Virginia, Plaintiff Below, Respondent

v.

Daniel L. HERBERT, Defendant Below, Petitioner

and

State of West Virginia, Plaintiff Below, Respondent

v.

Daniel L. Herbert, Defendant Below, Petitioner.

Nos. 13–1264, 13–0962.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 1, 2014.

Decided Nov. 25, 2014.

**580**

Ben J. Crawley–Woods, Esq., Martinsburg, WV, for the Petitioner in No. 13–1264.

Matthew L. Harvey, Esq., Taylor and Harvey, Martinsburg, WV, for Petitioner in No. 13–0962.

Cheryl K. Saville, Esq., Assistant Prosecuting Attorney, Martinsburg, WV, for the Respondent.

Justice KETCHUM:

The Defendant, Daniel L. Herbert, appeals his convictions arising from deliberately shooting a man twice in the back and, in the process, accidentally shooting an eight-year-old girl.

The Defendant's primary argument is that the circuit court violated his constitutional right to compulsory process for obtaining witnesses in his favor. At trial, the Defendant claimed he acted in self-defense, but the circuit court refused to require a victim, the alleged aggressor, to take the stand in the jury's presence on the ground that the witness refused to testify and that he was a security risk. The Defendant also argues that the count alleging he was a felon illegally in possession of a firearm should have been bifurcated for trial. He contends the circuit court erred by refusing to bifurcate the issue of whether he was previously convicted of a felony crime of violence against another person from the issue of whether he carried a firearm.

Based upon our review, we find no reversible error and affirm the Defendant's convictions.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 4, 2012, an estimated 2,000 people attended a celebration at War Memorial Park in Martinsburg, West Virginia. The Defendant and one of the gunshot victims, Gabriel McGuire, were acquaintances who attended the celebration. Their interaction began as conversation.

The dialogue between the Defendant and McGuire deteriorated. McGuire momentarily flashed a folding knife with a blade measuring about four to five inches. However, he

folded the knife, put it back in his pocket, and resumed his conversation with the Defendant.

About thirty to forty-five seconds later, the Defendant shot once or twice at McGuire with a .38 caliber revolver but did not initially hit McGuire. McGuire ran away, but the Defendant chased him and continued to shoot. The Defendant ultimately shot McGuire twice in the back. In the process, he also shot and wounded a bystander, an eight-year-old girl. The Defendant fled on foot until police officers caught him close-by.

A Berkeley County grand jury indicted the Defendant on two counts of attempted murder, three counts of malicious assault, five counts of wanton endangerment, and one count of fleeing from a law enforcement officer by means other than use of a vehicle. An additional count alleged that he carried a firearm while he was a felon prohibited from possessing a firearm.

The circuit court severed the "felon illegally in possession of a firearm" count from the other counts. The Defendant was first tried on the "felon illegally in possession of a firearm" count on May 28, 2013. Before trial, the Defendant moved to bifurcate the question of whether he had a prior felony conviction from the question of whether he possessed a firearm. The circuit court denied his motion, and he was found guilty by the jury on that count.

The Defendant was then tried on the remaining counts on September 3, 2013. At trial, the Defendant alleged he acted in self-defense. However, eight witnesses testified to seeing him shoot while chasing McGuire. The jury found the Defendant guilty of two counts of attempted murder of the first degree, three counts of malicious assault, two counts of wanton endangerment involving a firearm, and one count of fleeing from a law enforcement officer by means other than use of a vehicle. Following the jury's verdict, the Defendant filed a motion for a new trial, which the circuit court denied.

## II.

### STANDARD OF REVIEW

The standard of review of a decision by a circuit court denying a new trial is as follows:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, State v. Vance, 207 W.Va. 640, 535 S.E.2d 484 (2000).

## III.

### ANALYSIS

The Defendant alleges the circuit court committed reversible error by: (1) failing to make a witness invoke his constitutional privilege against self-incrimination in front of the jury, thereby ostensibly violating the Defendant's constitutional right to compulsory process for obtaining witnesses in his favor; (2) failing to instruct the jury it could make a negative inference from the witness's refusal to testify; (3) failing to exclude an officer's comment that the Defendant refused to consent to a gunshot residue test; (4) improperly instructing the jury on the transferred intent doctrine; and (5) declining to bifurcate the question of whether the Defendant was previously convicted of a felony crime from the issue of whether he possessed a firearm.

We find no reversible error as to any of the assignments of error the Defendant raises. As set forth below, we affirm the Defendant's convictions.

### A. *The handling of McGuire as a potential witness*

The Defendant alleged at trial that he acted in self-defense when he shot McGuire. McGuire survived the shooting, but he indicated before the trial that he would refuse to testify. McGuire was brought from an out-of-state federal penitentiary to the Defendant's trial. After arriving in West Virginia, when asked by a detective whether he was

willing to testify, McGuire said that the prosecutors in the Defendant's case could "s—t in one hand and wish in the other and see which one fills first."

The prosecutor informed the court at the end of the first day of the Defendant's trial that he would call McGuire as a witness the next day, but he warned the court that McGuire might physically resist being placed on the stand and refuse to testify. Likewise, defense counsel stated that extra bailiffs may be necessary when McGuire is brought into the courtroom. The circuit court added two bailiffs to handle McGuire in the courtroom.

The State called McGuire to testify the next day. Over the Defendant's protests, the court sent the jury into the jury room before having McGuire brought into the courtroom. The circuit court explained to the parties, outside the presence of the jury, that it had been informed that McGuire's presence would constitute a security issue.

Although McGuire was in shackles and handcuffs, he was very combative and was cursing when he was brought into the courtroom. At one point, he was beating his head against the wall. When the bailiffs were bringing him into the courtroom, he exclaimed: "Get off me, man. How can you (inaudible) in the f—king courtroom, man? I don't care. I'm not coming in here, man."

Once McGuire was brought into the courtroom, the following exchange took place outside the jury's presence:

COURT REPORTER: Mr. McGuire, is your last name spelled M–C–G–U–I–R–E?
MCGUIRE: (No response.)
. . .
COURT: Sir, are you willing to take the stand?
MCGUIRE: No, I'm not.
COURT: Okay. I'm going to hold you in contempt . . .

The court subsequently had McGuire removed from the courtroom. Upon the jury's return into the courtroom, the court told the jury that McGuire refused to take the oath and testify. The circuit court also told the jurors that it determined that McGuire could not be physically forced to testify.

Near the end of the trial, the Defendant called McGuire as a witness. Again, the circuit court sent the jury to the jury room over the Defendant's objections before having McGuire brought into the courtroom. McGuire again refused to testify and, on one occasion (outside the jury's presence), he abruptly stated, "I plead the Fifth." The Defendant's lawyer moved that McGuire be granted immunity and the prosecution agreed. Therefore, the circuit court granted McGuire immunity against any charges the State could bring against him arising out of his testimony.[1] After the grant of immunity, the following exchange took place outside the jury's presence:

MCGUIRE: . . . I have no intentions on testifying. I am not taking the stand and I am not testifying.
COURT: Are you saying that you refuse to take the stand?
MCGUIRE: That's what I'm saying. I refuse to take the stand and I refuse to testify.
COURT: Are you saying-so you are no longer taking the Fifth? You're just saying you refuse-
MCGUIRE: I refuse to talk, period, that's what I'm saying. I refuse to talk. I refuse to take the stand and I refuse to testify.
COURT: Would you raise your right hand and be sworn in?
MCGUIRE: No, I am not.
COURT: Okay. I'm not going to make any further inquiry. You may take him back. . . .

After dismissing McGuire from the courtroom, the circuit court brought the jury back into the courtroom. The court informed the

---

1. There are two types of immunity from prosecution a defendant can be offered in exchange for his/her testimony: use or transactional. The appendix-record does not specify which type of immunity McGuire was granted. For a discussion on the distinction between use and transactional immunity, *See* N. Hollander, *Standard of Potential Incrimination—Immunity,* Wharton's Criminal Procedure § 20:8 (14th ed.2010). *See also State ex. rel. Brown v. MacQueen,* 169 W.Va. 56, 285 S.E.2d 486 (1981).

jury that, like the day before, McGuire refused to testify. This time, however, the court added that McGuire had to be physically restrained while in the courtroom and that bringing him into the jury's presence would be a safety issue for the jury. The jury never saw McGuire.[2]

After the trial, the court entered a contempt order against McGuire. The order stated that McGuire was in custody and that the State secured his appearance for the Defendant's trial pursuant to a writ of habeas corpus *ad testificandum*. Importantly, the trial court found:

> The Court was advised by court security, out of the presence of the jury, that witness McGuire would not physically take the stand and expressed his intention to physically resist taking the stand. Out of the presence of the jury, witness McGuire was brought into the courtroom. He physically resisted the officers upon being brought into the courtroom and then banged his head against a wall. The Court inquired of the witness would he take the stand. Witness McGuire refused. He further refused to take the oath. Although the witness was no longer actively physically resisting, he had to be held by two security officers during this inquiry. Whereupon, the Court advised witness McGuire that he would be held in contempt. The witness still refused to comply with the Court's orders to take the stand and take the oath.

2. The Defendant raises no issue in this appeal concerning the circuit court's statements to the jury about McGuire's refusal to testify.

3. One could contend, from merely reading the record, that abruptly stating "I plead the Fifth" was not really a clear invocation of the privilege by McGuire. This, however, would read McGuire's comment out of its context. Regardless of what this Court may think, the circuit court, at the time, in the courtroom, believed that McGuire invoked the privilege, and thereafter offered him immunity from prosecution.

4. The Fifth Amendment states: "No person shall be held to ... be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend V. Likewise, West Virginia's State Constitution provides: "[N]or shall any person, in any criminal case, be compelled to be a witness against himself[.]" W.Va. Const. art. III, § 5.

McGuire was found in contempt for (1) misbehavior in the presence of the court and (2) disobedience to a lawful order of the Court.

In short, McGuire not only refused to testify at the Defendant's trial, but he also stated, "I plead the Fifth." The circuit court interpreted McGuire's actions as an invocation of the right against self-incrimination, and therefore granted McGuire immunity from prosecution.[3]

The Defendant argues that the circuit court erred when it failed to force McGuire to invoke his Fifth Amendment privilege against self-incrimination in front of the jury.[4] The Defendant further argues that when he called McGuire to testify, the circuit court's failure to put McGuire in front of the jury violated the Defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his favor.[5] The State counters that the circuit court's decision not to put McGuire in front of the jury was not error because McGuire could not have been forced to testify.

■ "The constitutional right against self-incrimination does not extend to prevent the physical appearance of a person at trial." Syl. Pt. 2, *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146 (1980). Ordinarily, a nonparty witness may not refuse to take the stand in a criminal trial by simply asserting the constitutional right against self-incrimination. " '(B)y universal holding, one not an accused must submit to inquiry (including

5. The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right to ... have compulsory process for obtaining witnesses in his favor[.]" U.S. Const. amend. VI. Likewise, our State Constitution provides: "In all such trials ... there shall be awarded to [a defendant] compulsory process for obtaining witnesses in his favor." W. Va. Const. art III, § 14.

The Defendant also argues that when the circuit court declined to put McGuire in front of the jury when the State called him, it violated the Defendant's constitutional right to confront the witnesses against him. This argument has no merit because the State did not use McGuire as a witness against the Defendant. Hence, there was nothing for the Defendant to confront. *See U.S. v. Soriano–Jarquin*, 492 F.3d 495, 504 (4th Cir.2007).

being sworn, if the inquiry is one conducted under oath)[.]' " *Id.*, 165 W.Va. at 504, 270 S.E.2d at 153 (quoting McCormick on Evidence § 136 (2d ed.1972)).

■■■ Furthermore, we have held that a witness asserting the privilege against self-incrimination must "take the stand, be sworn to testify, and assert the privilege in response to each allegedly incriminating question as it is asked." *In re Anthony Ray Mc.*, 200 W.Va. 312, 323, 489 S.E.2d 289, 300 (1997) (quoting *Roach v. Nat'l Transp. Safety Bd.*, 804 F.2d 1147, 1151 (10th Cir.1986)). As we said in *Harman*, one who is not an accused must take the stand and "may invoke the privilege only after the potentially incriminating question has been put. Moreover, invoking the privilege does not end the inquiry and the subject may be required to invoke it as to any or all of an extended line of questions." *Harman*, 165 W.Va. at 504, 270 S.E.2d at 153 (quoting McCormick on Evidence § 136 (2d ed.1972)). Accordingly, the ordinary rule is that a non-party witness must assert his/her Fifth Amendment privilege against self-incrimination in front of the jury.[6]

Nevertheless, in *State v. Whitt*, 220 W.Va. 685, 649 S.E.2d 258 (2007), a case in which a co-accused of the defendant refused take the stand in the jury's presence, this Court held that a trial court has discretion to exclude a witness from the jury's presence when the witness intends to invoke the constitutional privilege against self-incrimination. *Whitt* states:

> Where a defendant in a criminal case seeks to call a witness to the stand who intends to invoke his or her Fifth Amendment privilege against self-incrimination and the defendant has presented sufficient evidence to demonstrate the possible guilt of the witness for the crime the defendant is charged with committing, the trial court has the discretion to compel such witness to invoke his or her Fifth Amendment privilege in the presence of the jury.

Syl. Pt. 6, *Whitt*, 220 W.Va. 685, 649 S.E.2d 258. In *Whitt*, we further held that a court's discretion on this issue should be guided by whether the defendant would be unfairly prejudiced if the witness did not take the stand to invoke the privilege in the jury's presence. Syl. Pt. 7, *Whitt*, 220 W.Va. 685, 649 S.E.2d 258.

*Whitt* is factually distinguishable from this case because McGuire is the victim, not the co-accused for the crime the Defendant is charged with; no one is alleging McGuire shot himself in the back. Nevertheless, we find this holding in *Whitt* problematic because it suggests that when a witness blithely asserts a blanket privilege against self-incrimination, the trial court has the discretion to keep the witness off of the stand for any and all questions. Allowing a non-party witness to unilaterally keep him/herself off the witness stand by merely offering a blanket invocation of the privilege against self-incrimination is inconsistent with our procedure for a witness to invoke this constitutional privilege. *See Anthony Ray Mc.*, 200 W.Va. at 323, 489 S.E.2d at 300 (holding that non-party witnesses must "take the stand, be sworn to testify, and assert the privilege in response to each allegedly incriminating question as it is asked").

■■■ We therefore hold that, in a criminal trial, when a non-party witness intends to invoke the constitutional privilege against self-incrimination, the trial court shall require the witness to invoke the privilege in the presence of the jury. The constitutional privilege against self-incrimination may only be invoked when a witness is asked a potentially incriminating question. To the extent *State v. Whitt*, 220 W.Va. 685, 649 S.E.2d 258 (2007), is inconsistent with this holding, it is hereby modified.

We are mindful that our holding does not mirror the shortcut majority approach of some federal courts in regards to when a non-party witness intends to refuse to testify. *See, e.g., Bowles v. U.S.*, 439 F.2d 536, 541–42

---

**6.** We note that the circuit court was initially of the opinion that McGuire should take the stand and invoke his constitutional privilege against self-incrimination in front of the jury. The circuit court changed its mind, however, upon determining that McGuire could not physically be forced to take the stand and testify and that he was a security risk and a potential threat to the safety of the jury.

(D.C.Cir.1970) (holding that a witness should not be put on the stand for the purpose of having him exercise his privilege before the jury, partly on the ground that the "jury may think it high courtroom drama[.]"); *See also, U.S. v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973) ("If it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand").[7] We also note that the United States Supreme Court has not ruled on this issue, meaning that the states have discretion on how to approach this issue under the federal Fifth Amendment and respective state constitutions.

The majority approach is largely comprised of cases from the federal courts, and many of the state court decisions following the federal courts do so with very little analysis. This Court has often noted that federal case law "may be persuasive, but it is not binding or controlling" on this Court. *Brooks v. Isinghood,* 213 W.Va. 675, 682, 584 S.E.2d 531, 538 (2003). While we certainly give deference to federal court interpretations of the federal Constitution, this does not mean that our interpretation of rights under our state Constitution "should amount to nothing more than Pavlovian responses to federal decisional law." *Stone v. St. Joseph's Hosp. of Parkersburg,* 208 W.Va. 91, 112, 538 S.E.2d 389, 410 (2000) (McGraw, J., concurring, in part, and dissenting, in part).

Our reading of the majority approach is that it impedes a defendant's fundamental right to present a complete and strong defense, a principle which is embodied in the Compulsory Process Clause of both the Sixth Amendment of the U.S. Constitution and Article III, Section 14 of the *West Virginia Constitution.* When the right to compulsory process is curtailed, a defendant's ability to counter the prosecution's case is diminished. Even though juries are instructed to presume a defendant's innocence, they may still improperly infer a defendant's guilt when an important witness fails to testify—particularly if defense counsel, in opening statement,

refers to this person as a witness to the events that occurred.

We therefore feel that our deviation from the majority approach is necessary. This Court has a firmly established procedure for a non-party witness to invoke the privilege against self-incrimination, and this procedure has been extended to Article III, Section 5 of our state Constitution. *Harman,* 165 W.Va. at 504, 270 S.E.2d at 153 (quoting McCormick on Evidence § 136 (2d ed.1972)) (a non-party witness "may invoke the privilege only after the potentially incriminating question has been put."). Allowing a witness to avoid taking the stand because he/she intends to refuse to testify directly contradicts this procedure. It allows the witness to unilaterally avoid answering relevant, non-incriminating questions.

Even worse, the approach makes it possible for an uncooperative witness to defy a trial court's authority. *See Anthony Ray Mc.,* 200 W.Va. at 323, 489 S.E.2d at 300 (" 'The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified[.]' ") (quoting *Hoffman v. U.S.,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). Under the approach used by some federal courts, the witness can unilaterally invoke blanket immunity even though some questions may be non-incriminating. We have also noted that a witness who intends to invoke the privilege against self-incrimination may change his/her mind and testify once being placed on the stand. *See Whitt,* 220 W.Va. at 695, 649 S.E.2d at 268. However, this change of heart cannot occur if the witness is not first put on the stand and required to answer non-incriminating questions.

More importantly, however, the Sixth Amendment right to compulsory process for obtaining witnesses in his/her favor is a fundamental right, and excluding a defense witness from the jury's presence would impinge on this fundamental right for reasons outside

---

7. For a discussion on how various jurisdictions rule as to whether a non-party witness should be required to appear in front of the jury when he/she intends to refuse to testify, *See Gray v. State,* 368 Md. 529, 562–63, 796 A.2d 697, 716–17 (2002).

the defendant's control. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (holding the right to compulsory process is a fundamental right). Furthermore, when a witness is especially important to the defense (*e.g.*, when the witness is a co-accused), excluding the witness from the jury's presence may cause jurors to unfairly assume that the defense was frivolous or insincere because they did not see the witness be questioned. *See Gray v. State*, 368 Md. 529, 558, 796 A.2d 697, 714 (2002).

We also find that the rationale of the majority approach is arbitrary insofar as it claims that it is "high courtroom drama" to require a non-party witness to appear in front of the jury even though he/she intends to refuse to testify. We have said that the State has "a right to emphasize the fact of the crime to the jury in as graphic a manner as possible," *State v. Sette*, 161 W.Va. 384, 396, 242 S.E.2d 464, 472 (1978); why then should a defendant be denied the right to present his or her case just as dramatically? [8]

There are many forms of evidence that we have held admissible and which invoke a far more dramatic effect than a witness who insists on keeping silent in front of the jury. Some examples of highly dramatic evidence that we have allowed to be introduced before juries include gruesome autopsy photographs; [9] photos of a murder victim at the crime scene,[10] even photos depicting gunshot wounds through the head; [11] testimony by a murder victim's spouse and children; [12] suicide notes; [13] and testimony by a defendant's parents begging the jury to be merciful.[14] Certainly then, the possibility of "high courtroom drama" is not a sufficient reason to impinge on the defendant's right to compulsory process. The Constitution is not trumped by a little drama in the courtroom.

By contrast, our rule is consistent with the well-established mantra that "[a] witness may not invoke the right against self-incrimination by a 'blanket' refusal to testify but instead must take the stand, be sworn in, and assert the right in response to each allegedly incriminating question." *Fifth Amendment at Trial*, 41 Geo. L.J. Ann. Rev.Crim. Proc. 661, 670 (2013). *See also N. River Ins. Co. v. Stefanou*, 831 F.2d 484, 486–87 (4th Cir.1987) (witness cannot make blanket assertion of Fifth Amendment right because it is insuffi-

---

**8.** *See, e.g., State v. Mayle*, 178 W.Va. 26, 30, 357 S.E.2d 219, 223 (1987) ("Murder trials are often exciting for the jury. This one had more than the usual share of thrills. While the jury was visiting the scene of the murder, a van jumped the curb and apparently deliberately tried to run down several members of the jury. The van did not hit any jurors, but narrowly missed some.").

**9.** *State v. Mongold*, 220 W.Va. 259, 263, 647 S.E.2d 539, 543 (2007) (autopsy photos showing "four blunt impacts" to child victim's head admissible); *State v. Copen*, 211 W.Va. 501, 505, 566 S.E.2d 638, 642 (2002) (close-up photo of the disfigured face of the victim showing, "in somewhat high resolution, a gap in the victim's head where a bullet entered the victim's eye and exited through the victim's temple," and autopsy photos of her nude body on a morgue slab, front and back, were admissible).

**10.** *State v. Sette*, 161 W.Va. 384, 397, 242 S.E.2d 464, 472 (1978) (introduction into evidence of pictures of the dead victim and the area surrounding the room where she was murdered was not an abuse of discretion); *State v. Haddox*, 166 W.Va. 630, 635, 276 S.E.2d 788, 791 (1981) (three color photographs of victim's stab wounds admissible); *State v. Wheeler*, 187 W.Va. 379, 419 S.E.2d 447 (1992) (finding no reversible error in admission of twelve "gruesome" photographs of

blood trails of the victim, and two "blood-stiffened garments" into evidence).

**11.** *State v. Carey*, 210 W.Va. 651, 655, 558 S.E.2d 650, 654 (2001) (photograph of partially-dressed victim shot in head and stabbed admissible to show "the expanse of the room," and because it did not clearly "show the top of the victim's head blown away").

**12.** *State v. Wheeler*, 187 W.Va. 379, 388, 419 S.E.2d 447, 456 (1992) (finding no reversible error in trial court allowing murder victim's wife to testify for purpose of identifying the deceased and establishing his date of death, stating that "[C]ourts tend to look upon testimony by a surviving spouse with disfavor. However, the admission of such evidence does not necessarily constitute reversible error.").

**13.** *State v. Satterfield*, 193 W.Va. 503, 513, 457 S.E.2d 440, 450 (1995) (finding the probative value of a suicide note was not substantially outweighed by any unfair prejudice).

**14.** *State ex rel. Kitchen v. Painter*, 226 W.Va. 278, 289, 700 S.E.2d 489, 500 (2010) (defendant's mother testified and asked jury for mercy, after defendant was convicted of beating victim to death with a baseball bat).

cient to allow court to make reasonable assessment of risk of incrimination).

■ In this case, we find that the circuit court erred in allowing McGuire to make a blanket assertion of the Fifth Amendment because he had no right to do so. In dealing with McGuire, the trial court should have considered the alternatives available (which are discussed below) when a witness refuses to testify because of his/her invocation of the constitutional privilege against self-incrimination.

We turn now to whether the circuit court's failure to make McGuire appear in front of the jury violated the Defendant's constitutional right to compulsory process for obtaining witnesses in his favor. The State urges us to adopt the rule that "[o]nce a witness appears in court and refuses to testify, a defendant's compulsory process rights are exhausted." *See U.S. v. Griffin*, 66 F.3d 68, 70 (5th Cir.1995). This rule, however, lacks support from this Court's case law.

■ We are cognizant that: "[t]o safeguard the integrity of its proceedings and to insure the proper administration of justice, a circuit court has inherent authority to conduct and control matters before it in a fair and orderly fashion." Syl. Pt. 2, *State v. Fields*, 225 W.Va. 753, 696 S.E.2d 269 (2010). Furthermore, we realize that the circuit court made some effort to balance the Defendant's right to compulsory process with its concern for courtroom security by having McGuire shackled and handcuffed while he was in the courtroom, holding him in contempt for his refusal to testify, and adding two extra bailiffs to help handle McGuire in the courtroom.

■ However, instead of summarily declining to make a non-party witness appear in front of the jury on the ground that he/she is a courtroom security issue, trial courts should consider all of the available alternatives to control recalcitrant witnesses. For example, a trial court may, as the circuit court did in this case, hold a witness in contempt for refusing to testify, add extra bailiffs to handle the witness, have the witness in shackles and handcuffs while in the courtroom, *etc. See State v. Kuchera*, 198 N.J. 482, 969 A.2d 1052, 1065 (2009) (finding trial court acted within its discretion to allow witness, who was a state prisoner, to testify in leg shackles when witness was placed in jury box before jury entered courtroom). In addition, trial courts facing a recalcitrant witness should consider securing the witness's appearance via two-way-live video.[15]

■ The circuit court failed to consider having McGuire appear in front of the jury via two-way-live video even though doing so would have enhanced security in the courtroom while simultaneously protecting the Defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his/her favor. If the circuit court would have considered all of its options for handling McGuire as a witness, the Defendant would have had the benefit of the jury seeing the man who allegedly provoked him to act in self-defense. At the same time, however, the jurors would have been protected from any danger McGuire could have posed to them.

Therefore, we find the circuit court's decision not to make McGuire appear in front of the jury was error and violated the Defendant's constitutional right to compulsory process. In self-defense cases, the physical stature and demeanor of a victim-witness is

**15.** This Court has recently upheld a trial court's use of two-way-live video in handling potentially violent witnesses. *See State v. Cox*, No. 13–0778, 2014 WL 4930264 (W.Va. Oct. 2, 2014) (memorandum decision) (finding trial court did not abuse its discretion when it allowed six incarcerated witnesses to testify through videoconference on the ground that they were a potential security threat).

A defendant's Sixth Amendment right to confront the witnesses against him/her may be satisfied absent a physical face-to-face confrontation at trial where: (1) "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." *Maryland v. Craig*, 497 U.S. 836, 850, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In a similar situation, it has been held that allowing testimony via video conference of a witness who had been committed to a mental institution and was so unstable that "he posed a substantial risk to himself and others," did not violate the defendant's right to confront the witnesses against him. *Kramer v. State*, 277 P.3d 88, 94 (Wyo.2012).

important evidence. However, after careful review of the appendix-record in this case, we find this was harmless error. *See Sixth Amendment at Trial*, 40 Geo. L.J. Ann. Rev. Crim. Proc. 663, 691 (2011) ("A violation of the Compulsory Process Clause is … subject to harmless error analysis and will constitute harmless error if it is established beyond a reasonable doubt that the violation did not contribute to the verdict.").

█ In this case, eight witnesses testified to seeing the Defendant chase McGuire through a crowded park while shooting at his back multiple times. At the close of the trial, the circuit court gave the jury a self-defense instruction, and defense counsel was permitted to argue self-defense to the jury. Put simply, the question of self-defense was placed before the jury but was fully rejected. Consequently, even if the Defendant had the benefit of McGuire appearing in front of the jury, no reasonable jury would have found that the Defendant acted in self-defense. *See State v. Harden*, 223 W.Va. 796, 801, 679 S.E.2d 628, 633 (2009) ("A long-standing tenet of our self-defense doctrine is that a defendant's use of deadly force must be based upon a reasonable apprehension by the defendant that he or she was at imminent peril of death or serious bodily injury."). Accordingly, the Defendant is not entitled to a new trial on the issue of the circuit court's exclusion of McGuire from the jury's presence. Because of the overwhelming amount of the State's evidence, McGuire's appearance in front of the jury would not have changed the jury's verdict. Syl. Pt. 2, *State v. Frazier*, 229 W.Va. 724, 735 S.E.2d 727 (2012). *See also U.S. v. Valenzuela–Bernal*, 458 U.S. 858, 868, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.").

### B. *The Defendant's proposed negative inference jury instruction*

█ The Defendant submitted a proposed jury instruction that would have allowed the jury to draw a negative inference from McGuire's failure to testify. Even though the Defendant concedes that we have no case law *specifically* supporting negative inference jury instructions in criminal trials, he argues that *Whitt* entitles him to the benefit of a negative inference from a witness's failure to testify. *See Whitt*, 220 W.Va. at 698, 649 S.E.2d at 270 (2007).

This Court disagrees with the Defendant's argument under *Whitt* that the circuit court should instruct the jury to draw an inference favorable to the defendant from a witness's failure to testify. In fact, we note that courts across this country have expressed grave concern about such inferences.[16] Some of our concerns are encapsulated in the following language from the Connecticut Supreme Court:

Reason and human experience indicate that inferences [from a non-party witness's refusal to testify in a criminal proceeding] are certainly suggested by such a tactic; the danger inherent in this circumstance is that the inference or inferences drawn may have little, if any, juristic relation to the issues before the jury. More important, however, is the fact that the inference, whatever it may be, cannot be attacked effectively by cross-examination.

*State v. Bryant*, 202 Conn. 676, 684, 523 A.2d 451, 456 (1987).

Furthermore, an instruction allowing the jury to draw an inference from a non-party witness's failure to testify could be confusing to the jury because the witness's failure to testify could be favorable or adverse to either or both parties. This problem is especially apparent where, as here, the witness was called by both the defense and the prosecution but failed to testify for either side.[17]

---

16. *See Devia v. State*, 718 S.W.2d 72, 74 (Tex. App.1986) ("The refusal of such witness to testify on the grounds of self-incrimination cannot be made the basis of any reasonable inference by the jury, either favorable to the prosecution or favorable to the defense."). *Accord State v. Henry*, 176 Ariz. 569, 863 P.2d 861 (1993); *State v. Bryant*, 202 Conn. 676, 523 A.2d 451 (1987);

*Hutson v. State*, 747 S.W.2d 770 (Mo.Ct.App. 1988); *People v. Rivera*, 205 A.D.2d 563, 613 N.Y.S.2d 210 (N.Y.App.Div.1994).

17. We note that this case is unique in that McGuire refused to testify for both the prosecution and the defense. Therefore, a negative inference instruction based on McGuire's refusal to

■ Therefore, in a criminal trial, where a non-party witness invokes the constitutional privilege against self-incrimination or otherwise fails to testify, a party is not entitled to an instruction allowing the jury to infer that the witness's testimony would be favorable or unfavorable to either the defendant or the prosecution. To the extent *State v. Whitt*, 220 W.Va. 685, 649 S.E.2d 258 (2007), is inconsistent with this holding, it is hereby modified. Accordingly, the trial court was correct to reject the Defendant's proposed jury instruction allowing the jurors to make an inference favorable to the Defendant from McGuire's refusal to testify.

## C. *Comment by officer regarding the Defendant's non-cooperation*

■ The Defendant did not consent to gunshot residue testing at the time of his arrest, and he forced the officers to obtain a search warrant. Consequently, the officers were not able to get a gunshot residue sample from the Defendant until three to four hours after he had shot McGuire. The test results from the sample showed no trace of gunshot residue.[18]

When the State attempted to explain why no gunshot residue ("GSR") was found on the Defendant by questioning an investigating officer, the following exchange took place:

Prosecutor: Okay. Do you have any information as to what time the GSR was taken from [the Defendant]? .

Doyle: There was some time in the past several hours following. I believe if they do it like three or four hours afterwards that we took the GSR from [the Defendant]. Maybe less.

. . . .

Prosecutor: Is that ideal?

Doyle: Ultimately you would like to take them as quick as possible. *[The Defen-*

dant] was not cooperating with us at the time.

(Emphasis added.)

The Defendant moved to strike the officer's comment about him not being cooperative on the ground that it improperly referenced the Defendant's exercise of his constitutional right to not allow a search of his person without a warrant as well as his right to not give a statement. The circuit court overruled the Defendant's motion and later called the officer's comment "harmless at this point in time." The Defendant alleges that the circuit court erred by deciding not to strike the officer's comment.

As reflected by the trial transcript, the officer's comment about the Defendant's lack of cooperation was unresponsive to the prosecutor's question, and it was never mentioned again during the trial, nor was it dwelled upon by the prosecutor. We have held that a brief, unresponsive answer not dwelled upon by the prosecution is not prejudicial error. *See, e.g., State v. Hillberry*, 233 W.Va. 27, 34, 754 S.E.2d 603, 610 (2014) (an "unresponsive brief reference by a witness about a defendant's pretrial silence is not prejudicial error when the silence was not made an issue or dwelled upon by the prosecution"); *State v. Marple*, 197 W.Va. 47, 54, 475 S.E.2d 47, 54 (1996) (Even if the brief reference to a defendant's pretrial silence was plain error, it was not necessarily reversible error.). We do not find that the police officer's brief, unresponsive reference to the Defendant's failure to cooperate at the time of arrest affected the fairness of his trial. The prosecutor did not make it an issue or bring up the subject again. The court's decision not to strike the officer's comment does not amount to reversible error.

---

testify would be confusing to the jurors because they would not know which party to draw the inference against. In fact, because McGuire refused to testify for both sides, it is likely that any inferences drawn against the prosecution and against the Defendant would cancel each other out. For a discussion on negative inferences in criminal cases, *see* Wayne LaFave, *et. al., Forcing a Claim of Privilege By a Witness*, West's Criminal Practice Series § 24.4(c) (3d ed.2014).

**18.** One of the State's witnesses testified extensively regarding the fleeting nature of gunshot residue and compared it to chalk-dust, stating that "[t]he more time that passes, due to more activity [*sic*] the more particles could be removed."

██ The Defendant argues, in the alternative, that the circuit court should have issued a cautionary instruction telling the jurors that they could not hold the Defendant's exercise of his constitutional rights against him. At trial, the circuit court judge stated to the Defendant: "I think I'll give a cautionary instruction in the jury instructions *if that's requested.* My question about something like that is whether it emphasizes it more than ... emphasizes it more to bring it up." (Emphasis added). It appears from the appendix-record that this was a satisfactory answer as far as the Defendant was concerned.

The Defendant did not submit a proposed cautionary instruction during the charge conference, and he did not object to the jury instructions during the course of finalizing the instructions. Therefore, the circuit court's failure to include a cautionary instruction is reviewed as "plain error." *W.Va. R.Crim. P.* 30 [1995].

 We have held: "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995). In *Miller,* we stated that plain error is error that is clear or obvious. Syl. Pt. 8, *id.* We also stated that an error affected a defendant's substantial rights when it was prejudicial or affected the outcome of the case. Syl. Pt. 9, *id.* The Defendant, not the State, bears the burden of persuading the Court on this issue. Syl. Pt. 9, *id.*

We find no error in the circuit court's not giving a cautionary instruction as to the officer's comment. However, even if it was error, it was certainly not plain error. The circuit court noted that a cautionary instruction on the officer's comment may overemphasize the Defendant's lack of cooperation as to gunshot residue testing. The Defendant may have strategically decided not to submit a cautionary instruction on this matter because he agreed with the circuit court's comment.

Further, the circuit court's decision not to issue a cautionary instruction did not affect the Defendant's right to a fair trial. Given the amount of evidence against him (eight people testified that they saw him chase McGuire while shooting a gun), we are not convinced that it affected the trial's outcome. Therefore, the Defendant's assignment of error as to this issue is without merit.

### D. *Transferred intent jury instruction*

██ In instructing the jury on the count of attempted murder of the eight-year-old girl, the circuit court provided the elements of attempted murder of the first degree as being: "the willful, deliberate, premeditated, and malicious attempted killing of another person." The court's instructions also provided that before the jury may find the Defendant guilty of attempted murder of the first degree, the State must prove the following beyond a reasonable doubt:

1. The Defendant . . .
2. In Berkeley County, West Virginia,
3. On or about July 4, 2012,
4. Did unlawfully, intentionally, maliciously, willfully, deliberately and premeditatedly,
5. Attempt to kill [the eight-year-old girl].

The circuit court continued (with emphasis added):

If after impartially considering, weighing and comparing all the evidence, the jury and each member of the jury is convinced beyond a reasonable doubt of the truth of the charge as to each of these elements of Attempted Murder of the First Degree, you may find the Defendant guilty of Attempted Murder of the First Degree as charged in Count Four. *If the jury and each member of the jury has a reasonable doubt of the truth of the charge as to any one or more of these elements of Attempted Murder of the First Degree,* you shall find the Defendant not guilty of Attempted Murder in the First Degree as to this count and deliberate upon the lesser included *offense of Attempted Murder of the Second Degree.*

Finally, the circuit court gave a transferred intent instruction based on Syllabus

Point 6 of *State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991) ("The doctrine of transferred intent provides that where a person intends to kill or injure someone, but in the course of attempting to commit the crime accidentally injures or kills a third party, the defendant's criminal intent will be transferred to the third party.").

The Defendant did not object to the circuit court's transferred intent jury instruction. However, he now argues that, because the circuit court told the jurors they could transfer the Defendant's intent to murder McGuire to the shooting of the eight-year-old girl, the circuit court was obligated to specify that intent was the only element that may be transferred as between those two counts.

Due to the Defendant's failure to contemporaneously object, the instructions are reviewed for plain error under *West Virginia Rule of Criminal Procedure* 30 [1995]. A trial court's decision will not be disturbed unless there was: "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *Miller*, 194 W.Va. 3, 459 S.E.2d 114. An error does not affect substantial rights unless it was prejudicial, meaning it affected the trial's outcome. Syl. Pt. 9, *id.*

First, we find no error as to the circuit court's transferred intent jury instruction because it was supported by our law in *Julius*. *See* Syl. Pt. 4, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995) ("Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion."). Furthermore, the circuit court made clear that the jury had to find all the elements of attempted murder in order to convict the Defendant on the count as to the eight-year-old girl. The instructions provided that the jury could not return a guilty verdict on the attempted murder

count as to the eight-year-old girl if the jury had "a reasonable doubt of the truth of the charge as to *any one or more of these elements* of attempted murder in the first degree[.]" (Emphasis added).

However, even if there was error in the trial court's transferred intent instruction, it did not affect the trial's outcome, and therefore, it did not affect the Defendant's substantial rights. Syl. Pt. 9, *Miller*, 194 W.Va. 3, 459 S.E.2d 114. As stated multiple times in this opinion, eight witnesses testified to seeing him chase McGuire with the revolver. It is undisputed that in the process of chasing McGuire and firing this gun, he shot an eight-year-old girl. Therefore, we cannot say that the circuit court's failure to qualify its transferred intent instruction amounted to reversible error under the plain error doctrine.

### E. *Bifurcation of the felon illegally in possession of a firearm count*

■ The jury also convicted the Defendant of carrying a firearm when he was a felon prohibited from possession of a firearm in violation of W.Va.Code § 61–7–7(b)(1) [2008].[19] The circuit court denied the Defendant's motion to bifurcate for trial the issue of whether he was a convicted felon from the issue of whether he carried a firearm. The Defendant argues that the circuit court violated our holding in *State v. McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (2003), by denying his motion.[20] The Defendant's argument relies on the following language from *McCraine*:

A trial court must grant bifurcation in *all* cases tried before a jury in which a criminal defendant seeks to contest the validity of any alleged prior conviction *as a status element* and timely requests that the jury consider the issue of prior conviction *separately from the issue of the underlying charge.*

Syl. Pt. 11, in part, *McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (emphasis added).

---

**19.** W.Va.Code § 61–7–7(b)(1) [2008], provides, in part: "[N]o person shall possess a firearm ... who: has been convicted ... of a felony crime of violence against another person[.]" Effective July 16, 2013, the Legislature modified the 2008 version of W.Va.Code § 61–7–7 that was in effect during the July 2012 events underlying the De-

fendant's conviction. The modification has no effect on our decision.

**20.** The Defendant's prior felony conviction was for Aggravated Robbery.

**592**

■ The fact that a defendant has been previously convicted of a crime is a status element when: (1) his/her prior conviction makes otherwise legal conduct illegal, meaning that the prior conviction is an essential element of the current crime charged (*e.g.*, a felon possessing a firearm); or (2) the prior conviction is merely a penalty enhancer, meaning that it enhances the penalty for conduct that is itself illegal even without the defendant's prior convictions (*e.g.*, third-offense driving under the influence).

Our prior cases that discuss status elements have only involved the second type—penalty enhancers. Consequently, our case law has not distinguished between these two types of status elements (penalty enhancers versus essential elements of the current crime charged). Instead, our prior cases have treated all status elements the same regardless of whether they serve as an essential element of the current crime charged or as a penalty enhancer for conduct that is itself illegal.

Initially, our cases gave trial courts discretion to allow a prosecutor in a criminal case involving a status element to inform the jury of the name and nature of the defendant's prior convictions, even when the defendant stipulated to his/her status as a convicted felon. For example, in *State v. Hopkins*, 192 W.Va. 483, 453 S.E.2d 317 (1994), in which the defendant was charged with third-offense shoplifting (meaning the defendant's prior convictions were penalty enhancers), we stated: "[W]here a prior conviction is a necessary element of the current offense charged or is utilized to enhance the penalty after a jury finding that the defendant has committed such prior offense, it is admissible for jury purposes." *Id.*, 192 W.Va. at 489, 453 S.E.2d at 323 (quoting *State v. Cozart*, 177 W.Va. 400, 402, n. 1, 352 S.E.2d 152, 153, n. 1 (1986)).

However, even at that time, Justice Cleckley recognized that courts should treat status elements differently when they serve as an

essential element of the current crime charged rather than merely enhancing the penalty for conduct that is itself illegal. In a separate opinion, Justice Cleckley argued that the defendant's trial should have been bifurcated because the defendant's prior convictions were "elements of penalty enhancement," not "elements of the current charge." *Hopkins*, 192 W.Va. at 496, 453 S.E.2d at 330 (Cleckley, J., dissenting). However, all of our subsequent cases that limited a jury's exposure to status elements involved prior convictions that were elements of penalty enhancement.[21]

Five years after *Hopkins*, in a case where the defendant was charged with third-offense DUI (meaning the prior conviction enhanced the penalty for conduct that is itself illegal), we reversed course and established two, distinct rules in regards to when the defendant stipulates to his/her prior conviction and when the defendant challenges the validity of his/her prior conviction as a status element.

In regards to when the defendant *stipulates* to his/her prior conviction, we held that: "If a defendant makes an offer to stipulate to a prior conviction(s) that is a status element of an offense, the trial court must permit such stipulation and preclude the state from presenting any evidence to the jury regarding the stipulated prior conviction(s)." Syl. Pt. 3, in part, *State v. Nichols*, 208 W.Va. 432, 541 S.E.2d 310 (1999).

By contrast, in regards to when the defendant *challenges the validity of the prior convictions* as a status element, we held in Syllabus Point 4 of *Nichols* (with emphasis added) that:

> [The defendant] may request that the trial court bifurcate the issue of the prior conviction from that of the underlying charge and hold separate jury proceedings for both matters. *The decision of whether to bifurcate these issues is within the discretion of the trial court. In exercising this discretion, a trial court should hold a*

---

21. We note that the majority and the dissent in *Hopkins* disagreed on whether, in a third-offense shoplifting charge, prior convictions were penalty enhancers or necessary elements of the current charge. In a third-offense shoplifting charge, a prior conviction is not what makes

shoplifting illegal; rather, it merely enhances the penalty for shoplifting. In analogous charges, prior convictions are clearly penalty enhancers, not necessary elements of the current crime charged.

hearing for the purpose of determining whether the defendant has a meritorious claim that challenges the legitimacy of the prior conviction. If the trial court is satisfied that the defendant's challenge has merit, then a bifurcated proceeding should be permitted. However, should the trial court determine that the defendant's claim lacks any relevant and sufficient evidentiary support, bifurcation should be denied and a unitary trial held.

By giving trial courts discretion on the issue of bifurcating status elements, Justice Davis wisely noted that imposing a *per se* rule would force trial courts to "hold meritless bifurcated trials." *Id.*, 208 W.Va. at 447, 541 S.E.2d at 325.

Nevertheless, two years after *Nichols*, this Court again addressed a penalty-enhancing prior conviction (third-offense DUI) in *State v. Dews*, 209 W.Va. 500, 549 S.E.2d 694 (2001). In *Dews*, this Court eroded the discretion given to trial courts in *Nichols* as to penalty enhancers by prohibiting trial courts from mentioning to the jury a defendant's stipulation to a prior conviction. 209 W.Va. at 503, 549 S.E.2d at 697.

Two years after *Dews*, in *State v. McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (2003), this Court gutted *Nichols* and took away all discretion from trial courts on bifurcating prior convictions—even if they are an essential element of the offense charged rather than a penalty enhancer. In *McCraine*, the defendant's status of having multiple DUI convictions was a penalty enhancer when he was charged with third-offense DUI. Still, we held in Syllabus Point 11 of *McCraine* that, when the defendant challenges the validity of the prior conviction, the prior conviction *must* be bifurcated from the remaining elements of the current charge. Syl. Pt. 11, *State v. McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (2003). *McCraine* makes bifurcation mandatory for any prior conviction that is a status element of an offense regardless of whether it is a penalty enhancer or an essential element of the current offense charged.

Justice Davis wrote a scathing dissent in *McCraine* regarding this *per se* rule, noting that it would encourage "a terrible waste of judicial resources." *See McCraine*, 214 W.Va. at 206, 588 S.E.2d at 195 (Davis, J., dissenting). In *State v. Reed*, 218 W.Va. 586, 625 S.E.2d 348 (2005), Justice Davis further argued that the *McCraine* rule requiring bifurcation should be overruled and that *Nichols* should be reinstated. 218 W.Va. at 591, 625 S.E.2d at 353 (Davis, J., concurring).

Upon further reflection, we are persuaded to reject *McCraine's per se* rule that treats prior convictions that are penalty enhancers the same as prior convictions that are necessary elements of the current crime charged. Our law should distinguish between these two types of status elements. As Justice Cleckley suggested in *Hopkins*, 192 W.Va. at 496, 453 S.E.2d at 330, a defendant's prior convictions should be treated differently when they are "elements of penalty enhancement" rather than "elements of the current charge."

Accordingly, we find the *per se*, blanket holdings in *Dews* and *McCraine*, problematic, at least to the extent that they apply to a charge where the prior conviction makes otherwise legal conduct illegal (*e.g.*, a felon in possession of a firearm charge). When a defendant's status of having a prior conviction is an essential element of the current crime charged (because it makes otherwise legal conduct illegal), bifurcating that status element from the remaining elements results in one trial to determine if the defendant is a felon and another trial to determine if the defendant committed acts that were not themselves illegal. For instance, if the defendant's previous criminal conviction is bifurcated from the remaining elements in an illegal possession of a firearm charge, the jury, in a separate trial, must determine if the defendant is guilty of possessing a firearm, which is not illegal. In turn, ordinary jurors would be left to wonder why the defendant should be convicted of possessing a firearm when they themselves may legally possess, carry, and own guns.[22]

---

**22.** Multiple other jurisdictions share our concern that bifurcating a prior conviction from the re-

maining elements of the current crime charged may confuse the jurors when the prior conviction

When the defendant's status as a convicted criminal is an essential element of the current charge, it is important that the jury receive evidence of the prior conviction. In the case *sub judice*, if the jurors had not received evidence that the defendant was a felon, they would have been required to determine whether the defendant committed the crime of possessing a firearm, which is not illegal.

By contrast, where the defendant's prior convictions are mere penalty enhancers, the bifurcation of the status element from the remaining elements of the charge does not create confusion for the jury. For instance, if a prior conviction in a third-offense DUI case is bifurcated, the jurors would not be left to wonder why the defendant's driving under the influence was illegal if they were not informed of the defendant's prior convictions.

■ Therefore, when a defendant is charged with a crime in which a prior conviction is an *essential element* of the current crime charged (*e.g.* being a felon in possession of a firearm under W.Va.Code § 61–7–7(b)(1) [2008] ), and *does not stipulate* to having been previously convicted of a crime, the trial court shall not bifurcate the prior conviction from the remaining elements of the crime charged. To the extent *State v. McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (2003), is inconsistent with this holding, it is hereby overruled.

■ Furthermore, when a defendant is charged with a crime in which a prior conviction is an *essential element* of the current crime charged (*e.g.* being a felon in possession of a firearm under W.Va.Code § 61–7–7(b)(1)), and *stipulates* to having been previously convicted of a crime, the trial court

shall inform the jury that the defendant stipulated to the prior conviction. The jury shall be informed that the defendant was convicted of a prior felony or misdemeanor, but shall otherwise not be informed of the name or nature of the defendant's prior convictions. To the extent *State v. Dews*, 209 W.Va. 500, 549 S.E.2d 694 (2001), is inconsistent with this holding, it is hereby modified.

■ In addition, we are persuaded by Justice Davis's separate opinions in *McCraine*, 214 W.Va. 188, 588 S.E.2d 177, and *Reed*, 218 W.Va. 586, 625 S.E.2d 348, that the rule in *McCraine* is wrong. We are aware of the doctrine of *stare decisis*, but are also aware that, "[s]tare decisis is not a rule of law but is a matter of judicial policy. It is policy which promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation." *Adkins v. St. Francis · Hosp.*, 149 W.Va. 705, 718, 143 S.E.2d 154, 162 (1965). We believe that the *per se* rule of *McCraine* should be abandoned and that our procedure should mirror the discretionary analysis posited in Syllabus Point 4 of *State v. Nichols*, 208 W.Va. 432, 541 S.E.2d 310 (1999). Our decision to abandon *McCraine* demonstrates what Justice Brannon once said: "No legal principle is ever settled until it is settled right." *Town of Weston v. Ralston*, 48 W.Va. 170, 180, 36 S.E. 446, 450 (1900).

■ We therefore hold that when a defendant is charged with a crime in which a prior conviction merely *enhances the penalty* of the offense currently charged and *does not stipulate* to having been previously convicted of a crime, the defendant may request that the trial court bifurcate the issue of the prior conviction from that of the underlying charge

---

is a necessary element of the current crime charged. *See U.S. v. Collamore*, 868 F.2d 24, 28 (1st Cir.1989), *overruled on other grounds by U.S. v. Tavares*, 21 F.3d 1 (1st Cir.1994) ("[W]hen a jury is neither read the statute setting forth the crime nor told of all the elements of the crime, it may, justifiably, question whether what the accused did was a crime.... Doubt as to the criminality of [the] conduct may influence the jury when it considers the possession element."); *U.S. v. Barker*, 1 F.3d 957, 959 (9th Cir.1993) ("The bifurcation order [of a felon illegally in possession of a firearm charge] removes an ele-

ment of the crime from the jury's consideration, prevents the government from having its case decided by the jury, and changes the very nature of the charged crime."). *See also* D. Michael Risinger, *Johnny Lynn Old Chief, and "Legitimate Moral Force,"—Keeping the Courtroom Safe for Heartstrings and Gore*, 49 Hastings L.J. 403, 425 (1998) ("[I]f the jury is not informed that something special makes this a crime for this defendant when it would not be a crime for the jurors, it is not unreasonable to fear that the jurors may become confused, or refuse to convict for nullification reasons.").

and hold separate jury trials for both matters. The decision of whether to bifurcate these issues is within the discretion of the trial court. In exercising this discretion, a trial court should hold a hearing for the purpose of determining whether the defendant has a prima facie challenge to the legitimacy of the prior conviction. At the hearing, the defendant may proffer evidence that the prior conviction does not exist or is otherwise invalid. If the trial court is satisfied that the defendant's challenge has merit, then a bifurcated proceeding should be permitted. However, should the trial court determine that the defendant's claim lacks any relevant and sufficient evidentiary support, bifurcation should be denied and a unitary trial held. To the extent *State v. McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (2003), is inconsistent with this holding, it is hereby overruled.

 Where the defendant stipulates to a prior conviction that enhances the penalty of the current crime charged, there will necessarily only be one trial. We are mindful that a jury's knowledge of a defendant's prior crime by mention of his/her "stipulation has the same unfairly prejudicial effect as presenting the jury with other evidence of the offense[.]" *State v. Dews*, 209 W.Va. at 504, 549 S.E.2d at 698. Furthermore, when the prior conviction is a penalty enhancer, as opposed to a necessary element of the current crime charged, the jurors would not be required to determine whether the defendant committed an act which is not itself illegal if they are not informed of the prior conviction. Therefore, when a defendant *stipulates* to a prior conviction that merely *enhances the penalty* for the current charge, the jury shall not be informed of the prior conviction.

## IV.

### CONCLUSION

For the reasons set forth herein, we affirm the Defendant's convictions and sentences.

Affirmed.

1. The defendant's self-defense argument was destined for failure in light of the fact that he shot the victim multiple times in the back as the victim was running away from the defendant. Additional evidence that demonstrated the im-

LOUGHRY, Justice, concurring, in part, and dissenting, in part:

The majority creates new law for West Virginia, but without support from any other jurisdiction in the entire country. Overturning recent precedent, the majority holds that in criminal trials, trial courts "shall require" a non-party witness to invoke the privilege against self-incrimination "in the presence of the jury." This new rule of law is fraught with problems, including the potential for manipulation by allowing either the prosecution or the defendant to call a witness solely to allow the jury to draw adverse inferences from a witness's refusal to testify. The majority's decision will undoubtedly leave the trial courts of this state scratching their heads, wondering precisely to what extent they must "cattle prod" a witness into invoking the Fifth Amendment privilege in the jury's presence. And, because the privilege was never actually asserted by anyone in this case, there is no factual predicate for this Court to make any rulings regarding the Fifth Amendment. While I concur in the decision to affirm the defendant's convictions based on the overwhelming evidence of his guilt,[1] I dissent to the extent the majority creates an unsound new point of law regarding the Fifth Amendment privilege and unnecessarily overrules recent precedent in the process.

### I. Lack of Factual Basis for New Law

During the State's case-in-chief, the prosecutor called one of the victims of the defendant's crimes, Gabriel McGuire, to the witness stand. Having been advised that securing Mr. McGuire's trial testimony would likely be problematic, the following exchange took place:

Prosecutor: I think we should make the effort to bring him [McGuire] in....

Court: What, I'm going to have him ... drag him here?

Defense counsel: Yes.

possibility of self-defense was the introduction by the State of nine eyewitnesses, each of whom positively identified the defendant at trial as the shooter.

Prosecutor: I think that's because the problem, if he refuses to come, behave himself, which certainly the Court needs to inform the jury that we tried to get him in here, but he wouldn't come in.

Defense counsel: Maybe we should excuse the jury, bring him in here, find out if he's going to take the Fifth.

. . . .

Prosecutor: I ask that the jury be excused and bring in Mr. McGuire . . . . but the fact of him being drug in here by the officers and then drug in here screaming, that is not . . . that shouldn't be done in front of the jury . . . . what matters is what he says on the stand. . . .

. . . .

Defense counsel: As far as the jury, they have a victim. The jury is entitled to see that.

The Court: It is a different thing once he's in there, and if he refuses to testify I think that's a different thing than dragging him in here.

. . . .

Defense counsel: Well, they [the jury] will not be able to see it. That's relevant to my client. . . .

The Court: . . . . Why drag in a person?

. . . .

The Court: No . . . I'm not going to do it in front of the jury.

The trial court excused the jury from the courtroom after which the following was placed into the trial record:

Defense Counsel: . . . I would like the record to reflect that I think it's strongly prejudicial to my client that the jury had to be excused because the State didn't want them [the jury] to see [Mr.][ ] McGuire brought into the courtroom, and how, you know, as the trier of fact they get to examine everyone's demeanor, which includes the way they [witnesses] walk; how they're presented; their defiance to the Court; their defiance to the prosecutor; their defiance to the defense attorney. All that's relevant. We're talking about a self-defense case here, and we can't even get in the daggone victim. How is that not rele-

vant to my client? And the . . . character of the victim[?]

Prosecutor: . . . I think this is a court security issue. We do not need a fight in front of the jury, and what takes place until the witness gets on the witness stand is not evidence. What happens on the witness stand is evidence . . . . but I think we've got a major court security issue here. We do not want any fighting. We don't want a mistrial. . . . This is a matter of whether we can physically put the body on the stand, and we might not be able to, Judge.

The Court: Well, and just for the record, I've been informed by the chief bailiff that it's a security issue.

Thereafter, the record reflects that, as predicted, the courtroom bailiffs had to physically strong-arm a recalcitrant Mr. McGuire into the courtroom:

Mr. McGuire: Get off me, man. How can you (inaudible) in the f * * king court-room, man? I don't care. I'm not coming in here, man.

The Court: Okay. You need to bring him over here to be sworn in. Right here. Okay. Right there. Now, I'm going to bring in the jury.

Prosecutor: Judge, I object. . . . This is not evidence. He physically should not be in the courtroom with the jury. I think this is a court security issue, and I would say hold him in contempt and get him out of here. I do not want to see the officers tackle him in front of the jury. That's not evidence.

Court Reporter: Mr. McGuire, is your last name spelled M–C–G–U–I–R–E?

Mr. McGuire: (No response.)

. . . .

The Court: Sir, are you willing to take the stand?

Mr. McGuire: No, I'm not.

Upon confirmation of his refusal to testify, the trial court held Mr. McGuire in contempt of court and ordered that he be retained in the regional jail so that the defendant could call him as a witness in his case-in-chief the following day. The trial court warned Mr. McGuire that if he again refused to testify or

cooperate, he could be subject to additional contempt proceedings. Mr. McGuire promptly suggested that the trial court "might as well do that now, because I ain't coming out here and testifying, period." Disinclined to accept Mr. McGuire's suggestion, the trial court directed that he be removed from the courtroom, after which the following was placed in the trial record:

> Prosecutor: Your Honor, may the record reflect that the witness, Gabriel McGuire, refused to take the stand, not even to testify, and physically resisted the officers in the Court's presence ... and had to be held by two officers for the safety of all persons in this courtroom?
>
> The Court: And I just want to say for the record that I was informed by the chief bailiff that he appears to be a danger to the jurors if he's forced to take the stand....
>
> ....
>
> Defense counsel: As someone who's aggressive. A man who won't even take the stand under threat of being held in jail, and physically ... we saw him hit his head against the wall over here; physically resisted coming in here, and was aggressive with the bailiffs. I think his character is definitely a pertinent trait as this point.
>
> The Court: It's not a question of whether his character is a pertinent trait, but it's a question of whether self-defense has been.
>
> ....
>
> Prosecutor: Judge, it's not a pertinent trait until the defense shows that this was self-defense, and just because a person has a bad history and just because they're physically resistant to testifying ... is not sufficient evidence for self-defense. The defense has not raised any evidence that this is a self-defense case yet....

The trial court then made the following findings with regard to having held Mr. McGuire in contempt of court:

> The Court: ... [F]or the record ... there was an attempt to bring him [McGuire] in here. He made it very clear that he would not cooperate; that he would refuse to testify, and wouldn't even take the oath; and there were two bailiffs that had to restrain him when he was in the court-

room. Several other bailiffs who were standing around, and I noticed it appeared, based on his behavior and his demeanor, that he would actually pose a danger to the jurors, and a court security issue if he were to get here. I was notified there would be a fight in front of the jury.

> Defense counsel: And, Your Honor, he didn't ... he just refused to cooperate. He didn't plead the Fifth.
>
> The Court: No, he did not plead the Fifth.

It is clear from this exchange that defense counsel recognized that Mr. McGuire was not invoking the Fifth Amendment privilege; rather, he "just refused to cooperate." Upon their return to the courtroom, the trial court advised the panel that Mr. McGuire had been subpoenaed to testify; that he refused to take the oath or to testify; that the court did not feel that he could be physically forced to take the oath or to testify; and that the court was holding him in contempt.

Later, when counsel and the trial court discussed the anticipated appearance of Mr. McGuire the next day for the defendant's case in chief, the following exchange occurred:

> Prosecutor: ... [W]hen he calls Mr. McGuire as a witness ... either we do this outside of the presence of the jury ... I think it is unjust to have a police officer holding him, gagging him, on the stand him fighting, and it's just not proper. The guy can take the Fifth .... but you're not supposed to call a witness to the stand if that witness is going to take the Fifth.
>
> The Court: Based on what I saw, I don't think we would ever get to that point ...
>
> Prosecutor: Right, and I don't think we're going to get to that point either.

Again, the trial court recognized that Mr. McGuire would never reach the point of invoking the privilege if he continued in his refusal to take the witness stand and be sworn.

The following morning, and over defense counsel's objection, the trial court excused the jury before efforts were made to escort Mr. McGuire to the witness stand—this time as a witness for the defense. After Mr.

McGuire was brought into the courtroom, the following transpired:

> The Court: Are you prepared to testify today?
>
> Mr. McGuire: I plead the Fifth.
>
> . . . .
>
> Defense counsel: He don't [sic] have the Fifth.

Notwithstanding defense counsel's protestation that Mr. McGuire did not have a Fifth Amendment privilege, the trial court granted immunity to Mr. McGuire in its continuing effort to secure his testimony for the defense. The effort was unsuccessful because Mr. McGuire continued in his refusal to take the witness stand:

> Mr. McGuire: . . . I have no intentions of testifying. I am not taking the stand and I am not testifying.
>
> The Court: Are you saying that you refuse to take the stand?
>
> Mr. McGuire: That's what I'm saying, I refuse to take the stand and I refuse to testify.
>
> The Court: Are you saying—so you are no longer taking the Fifth. You're saying you refuse—
>
> Mr. McGuire: I refuse to talk, period, that's what I'm saying, I refuse to talk. I refuse to take the stand and I refuse to testify.

**2.** The defendant may have benefitted from Mr. McGuire's refusal to take the witness stand because he averted Mr. McGuire's likely denial of having a knife or threatening the defendant in any manner. In addition, the trial court repeatedly informed the jury of Mr. McGuire's contumacious behavior when efforts were made to have him take the witness stand:

> While the jury was out, Mr. McGuire was brought into the courtroom in custody. He was physically restrained. Both sides sought to call him as a witness . . . they both have a right to compel witnesses to come before the Court.
>
> As with yesterday, Mr. McGuire refused to take the oath and said he would refuse to testify. He does not have grounds to refuse to take the stand and he does not have grounds to refuse to take the oath. However, my powers are limited to holding him in contempt until he testifies and because . . . he is here for purposes of testimony only from federal custody, I don't have much force or influence in terms of doing that. . . .

> The Court: Would you raise your right [hand] to be sworn in?
>
> Mr. McGuire: No, I am not.[2]

The foregoing colloquy indisputably demonstrates that the issue in this appeal was not the Fifth Amendment. Significantly, following the trial court's award of immunity to Mr. McGuire in its effort to secure his testimony, Mr. McGuire merely took up the recalcitrant mantra he had voiced the day before when called as a witness by the prosecution: "I refuse to take the witness stand; I refuse to take the oath; and I refuse to testify in any manner." Mr. McGuire did not dispute the trial court's statement "so you are no longer taking the Fifth." In short, there is simply no factual basis for the majority to adopt a new rule of law regarding a non-party's witness's invocation of the Fifth Amendment privilege. This is absolutely not a Fifth Amendment case.

## II. Fifth Amendment Privilege

Despite the clear dearth of factual support in the record for its new rule of law, the majority holds in syllabus point two that "[i]n a criminal trial, when a non-party witness intends to invoke the constitutional privilege against self-incrimination, the trial court shall require the witness to invoke the privilege in the presence of the jury[,]" and "[t]o the extent *State v. Whitt,* 220 W.Va. 685, 649 S.E.2d 258 (2007), is inconsistent with this holding, it is hereby modified."[3] While I am

> The bailiffs have determined yesterday that it was a Court security issue in bringing him here in the presence of the jury and that it would be a safety issue for those involved. The record further reflects that during closing arguments, defense counsel was allowed to describe Mr. McGuire's behavior as bailiffs endeavored to get him to the witness stand, including the fact that he beat his own head against the wall; to argue that Mr. McGuire is a man known for violence; to allege that Mr. McGuire is a "belligerent gang member;" to suggest that Mr. McGuire's refusal to testify was a sign that he was the aggressor; and to reference a rumor that Mr. McGuire had beaten a murder charge on a prior occasion.

**3.** Although the majority touts the benefits of its new rule of law for criminal defendants, depending upon whether a witness is particularly important, I cannot discern how requiring the jury to observe the efforts to get Mr. McGuire into the courtroom and onto the witness stand would have bolstered the defendant's self-defense claim

not adverse to adopting a new point of law where warranted, I prefer to act in accordance with Justice Ketchum's recent observation: " 'An appellate court should not overrule a previous decision recently rendered without evidence of changing conditions or serious judicial error in interpretation sufficient to compel deviation from the basic policy of the doctrine of stare decisis, which is to promote certainty, stability, and uniformity in the law.' " *Sostaric v. Marshall*, 234 W.Va. 449, 766 S.E.2d 396 (2014) (quoting Syl. Pt. 2, *Dailey v. Bechtel Corp.*, 157 W.Va. 1023, 207 S.E.2d 169 (1974)). Although I concurred in the new law adopted in *Sostaric*, I cannot do so in the case *sub judice* given the undeniable absence of any "changing condition[ ] or serious judicial error" in *Whitt*.[4] *Id*.

While the majority recognizes the "majority approach" to the issue, it ignores that approach and creates a new point of law without any sound legal reasoning. Under the established "majority approach," a party may not compel a non-party witness to take the witness stand solely for the purpose of having that witness assert his or her Fifth Amendment privilege in front of a jury. In dismissive fashion, however, the majority states that this "majority approach" is "largely comprised of cases from the federal courts." The majority's analysis is seriously flawed as state courts throughout the country follow the "majority approach."[5] *See People v. Fletcher*, 193 Colo. 314, 566 P.2d 345, 347 (1977) (stating that neither defendant nor prosecution may call witness to testify before jury to claim privilege against self-incrimination); *State v. Eichstedt*, 20 Conn.App. 395, 567 A.2d 1237, 1240 (1989) (finding no error where trial court would not allow defense witness to be placed on stand merely to have witness exercise privilege

against self-incrimination); *Martin v. United States*, 756 A.2d 901, 904 (D.C.2000) ("The law is clear that if a witness has declared unequivocally that he will not testify on the basis of the Fifth Amendment privilege against self-incrimination, the witness should not be placed on the stand and required to make that claim in front of the jury."); *Apfel v. State*, 429 So.2d 85, 86–87 (Fla.Dist.Ct. App.1983) (recognizing trial court erred by permitting witness to testify in jury's presence solely for purpose of invoking Fifth Amendment); *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358, 1365 (1983) (recognizing that witness should not be called for sole purpose of allowing the jury to observe witness's claim of privilege against self-incrimination); *Dumas v. Com.*, No. 2010–SC–000378–MR, 2011 WL 2112560, *7 (Ky. May 19, 2011) (citing *Clayton v. Com.*, 786 S.W.2d 866, 868 (Ky.1990)) (recognizing that neither party can call witness who will refuse to testify on Fifth Amendment grounds); *State v. Gerard*, 685 So.2d 253, 259 (La.Ct.App.1996) ("Once the trial judge determined that the witness would refuse to answer any questions about the murder ... it was proper for her not to allow the witness to be called before the jury."); *Com. v. Gagnon*, 408 Mass. 185, 557 N.E.2d 728, 736 (1990) (finding trial judge has no discretion to permit witness to appear before jury solely for purpose of invoking privilege against self-incrimination); *People v. Crisp*, No. 224307, 2002 WL 737784 (Mich. Ct.App. Apr. 23, 2002) (citing *People v. Dyer*, 425 Mich. 572, 390 N.W.2d 645 (1986)) (holding that neither defense nor prosecution could call witness solely to have him assert his Fifth Amendment privilege in front of jury); *State v. Nunez*, 209 N.J.Super. 127, 506 A.2d 1295, 1298 (N.J.Super.Ct.App.Div.1986) ("[I]t is clear that a de-

where he shot Mr. McGuire multiple times in his back as he ran from the defendant. Indeed, the jury's witnessing the drama of Mr. McGuire being dragged into the courtroom as he spewed expletives would beg for a mistrial, rather than constitute admissible evidence.

**4.** The Fifth Amendment issue is not the only instance where the majority creates new law without a sufficient factual predicate. New syllabus points six and seven address penalty enhancing status element offenses, even though the de-

fendant was not charged with such an offense. The majority failed to recognize that his status as a felon was a necessary element of the crime with which he was charged.

**5.** Contrary to the majority's suggestion that state courts follow the "majority approach" with "very little analysis," those courts have articulated sound reasoning for following the majority approach, which was recognized in *Whitt*, 220 W.Va. 685, 649 S.E.2d 258.

fendant cannot call a witness solely for the purpose of having him assert his Fifth Amendment rights before the jury."); *State v. Whiteside,* No. 08AP–602, 2009 WL 1099435, *13 (Ohio Ct.App. Apr. 23, 2009) (upholding conviction and finding "there is no 'right' of defendant to call a witness solely for the purpose of invoking his or her Fifth Amendment rights in front of the jury") (citation omitted); *State v. Barone,* 329 Or. 210, 986 P.2d 5, 20 (1999) (recognizing that prosecution may not put accomplice on witness stand solely for purpose of having accomplice invoke Fifth Amendment privilege in front of jury unless accomplice no longer possessed valid Fifth Amendment privilege against self-incrimination); *Com. v. Pritchard,* 270 Pa.Super. 461, 411 A.2d 810, 814 (1979) ("[D]efense counsel was precluded from asking a witness a question knowing that the witness would invoke the Fifth Amendment's privilege against self-incrimination.") (citation omitted); *Brown v. State,* No. 13–04–00125–CR, 2005 WL 1995326 (Tex.App. Aug. 18, 2005) ("[A] defendant has no right to have a witness merely assert his privilege against self-incrimination in front of the jury.") (quoting *Bridge v. State,* 726 S.W.2d 558, 567 (Tex.Crim.App.1986)).[6]

We recently acknowledged this accepted practice in *Whitt,* 220 W.Va. 685, 649 S.E.2d 258, stating that an exception to the *"general rule against allowing a witness to take the stand solely for the purpose of exercising his or her Fifth Amendment privilege against*

*self-incrimination"* may be warranted in particular cases. *Id.* at 696, 649 S.E.2d at 269 (emphasis added). Shunning both the general rule and the Court's recent recognition of it in *Whitt,* the majority chooses to rely upon *In re Anthony Ray Mc.,* 200 W.Va. 312, 489 S.E.2d 289 (1997). *Anthony Ray* involved a non-party witness's invocation of the privilege against self-incrimination in the context of a "Rule 804(b)(3) against penal interest unavailability issue." *Id.* at 324, 489 S.E.2d at 301. Because the Fifth Amendment privilege was being analyzed within the context of an exception to the hearsay evidentiary rule, rather than whether constitutional compulsory process requires a non-party witness to assert the Fifth Amendment privilege in the jury's presence, *Anthony Ray* fails to support the majority's new rule of law. *See Washington v. Texas,* 388 U.S. 14, 23 n. 21, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (finding defendant was denied right to compulsory process for obtaining witnesses in his favor where testimony of defense witness was denied because state statute made witness's testimony inadmissible but also explaining that "[n]othing in this opinion should be construed as disapproving testimonial privileges ... which are based on entirely different considerations from those underlying the common-law disqualifications for interest").

The majority also relies upon *State v. Harman,* 165 W.Va. 494, 270 S.E.2d 146 (1980),

---

**6.** As the majority correctly observes, many federal courts also follow the general prohibitory rule. *See, e.g., U.S. v. Santiago,* 566 F.3d 65, 70 (1st Cir.2009) (quoting *United States v. Rivas–Macias,* 537 F.3d 1271, 1275 n. 3 (10th Cir.2008)) ("Because a jury may not draw any legitimate inferences from a witness' decision to exercise his Fifth Amendment privilege, we have repeatedly held that neither the prosecution nor the defense may call a witness to the stand simply to compel him to invoke the privilege against self-incrimination."); *United States v. King,* 461 F.2d 53, 57, and n. 4 (8th Cir.1972) (ruling that decision to call witness to invoke Fifth Amendment privilege where no useful purpose would be served was error notwithstanding that curative instruction was given); *United States v. Gutierrez,* 122 F.3d 1075 (9th Cir.1997) (Table) (finding defendant had no right to call witness for sole purpose of compelling witness to invoke the Fifth Amendment privilege before the jury) (citing *United States v. Licavoli,* 604 F.2d 613, 624 (9th Cir.

1979)) ("[B]ecause the trial court determined that [witnesses] would refuse to testify if called, the court correctly ruled that [defendant] could not call them as witnesses for the sole purpose of compelling them to invoke their Fifth Amendment privilege in front of the jury."); *United States v. Kamahele,* 748 F.3d 984, 1018 (10th Cir.2014) ("A prosecutor cannot call witnesses solely for them to invoke the Fifth Amendment privilege against self-incrimination."); *United States v. Crawford,* 707 F.2d 447, 449 (10th Cir. 1983) (recognizing that neither prosecution nor defense may call witness knowing that witness will assert his Fifth Amendment privilege against self incrimination); *see also* 81 Am.Jur.2d Witnesses § 121 (2004) ("[T]he court ordinarily should not permit a witness to testify on direct if the court has adequate reason to believe that the witness validly will invoke Fifth Amendment privilege on cross-examination with regard to matters which are bound up with those discussed on direct.").

which equally fails to lend support for the majority's ruling. Upon a close reading, *Harman* does not even address the issue of whether a non-party witness can be compelled to the witness stand solely to invoke the Fifth Amendment privilege against self-incrimination. At issue in *Harman* was a trial court's refusal to bring an incarcerated accomplice to the defendant's trial because the accomplice's counsel would not give his permission to do so. The focus in *Harman* was solely on whether a witness could avoid being brought to the courtroom by invoking the Fifth Amendment privilege against self-incrimination. It did not address whether a non-party witness can be compelled to invoke the Fifth Amendment privilege in the jury's presence. In the case at bar, there is no indication that Mr. McGuire invoked the Fifth Amendment to avoid being physically brought to the situs of the defendant's trial. In fact, he was transported to the courtroom from an out-of-state federal prison for the express purpose of the defendant's trial.

The majority further cites *Harman* for the proposition that "a witness may not refuse to take the stand," yet this is precisely what Mr. McGuire did. In ruling that the Fifth Amendment privilege may only be invoked after a potentially incriminating question has been asked of the witness, the majority again cites *Harman* as support.[7] However, Mr. McGuire's refusal either to be sworn or to testify made it impossible to reach an incriminating question. In short, *Harman* is wholly inapposite to the situation faced by the trial court in the case *sub judice*.[8]

I find persuasive that in *Whitt*, this Court observed that neither *Anthony Ray* nor *Harman* answered the question presented: whether a witness who was granted immunity by the trial court and acquitted of the murder for which the defendant was on trial had a Fifth Amendment privilege against self-incrimination with respect to the murder. In the face of the general rule that a witness is not to be placed on the witness stand solely to invoke the Fifth Amendment privilege, we recognized a narrow exception that under certain circumstances, a defendant's constitutional compulsory process rights may warrant an exception to that general rule where the defendant offers a "proffer regarding the events to which the witness might testify along with a demonstration of the relevance of such testimony ... to meet the requisite showing that the testimony would have been *both material and favorable to the defense*[.]" *Whitt*, 220 W.Va. at 687, 649 S.E.2d at 260, syl. pt. 4, in part (emphasis added). Here, the majority fails to address the fact that no such evidentiary proffer was made by the defendant. Although Mr. McGuire's testimony would likely have been material, I find it difficult to fathom how it could have been favorable to the defendant's claim of self-defense, particularly where the defendant shot Mr. McGuire multiple times in the back as he was running away from the defendant. *See State v. White*, 231 W.Va. 270, 744 S.E.2d 668 (2013) (concluding that evidence of defendant running after victim and shooting him was sufficient for jury to find that defendant was not acting in self-defense).

In those instances where jurisdictions have deviated from the general prohibitory rule, the determination of whether a witness

---

7. Although the majority also holds in syllabus point two that a non-party witness cannot invoke the privilege against self-incrimination until being asked an incriminating question, and suggests in its discussion that this new rule of law will somehow make it impossible for an uncooperative witness to defy a trial court's authority, I fail to see how the majority's holding would have in any way aided the trial court in the case at bar. Clearly, this new point of law will not facilitate or secure the testimony of a witness, such as Mr. McGuire, who simply refuses to be sworn or to testify in any manner. Further, those situations where a witness intends to invoke the privilege upon being sworn are covered by the general rule against calling an individual to the witness stand solely for that purpose. As for situations where a witness answers certain questions, but pleads the Fifth Amendment to others, those witnesses are obviously already sworn and before the jury, negating any need for the compulsion the majority mandates.

8. The only other case cited by the majority in support of its new law is *North River Ins. Co., Inc. v. Stefanou*, 831 F.2d 484 (4th Cir.1987), a civil case addressing a defendant's assertion of the Fifth Amendment privilege against self-incrimination in relation to his filing of a responsive pleading in the action. *Stefanou* has absolutely no persuasive value to the case *sub judice*.

should be called before a jury for purposes of invoking his or her Fifth Amendment privilege is left to the sound discretion of trial courts based upon the particular facts and circumstances of the case. *See United States v. Johnson,* 488 F.2d 1206, 1211 (1st Cir. 1973) ("If it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand."); *United States v. Dey,* 409 Fed.Appx. 372, 2010 WL 3749101, *2 (2d Cir.2010) (citing *United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993)) ("A 'district court has the discretion to prevent a party from calling a witness solely to have him … invoke the privilege against self-incrimination in front of the jury.' "); *United States v. Griffin,* 66 F.3d 68, 70 n. 6 (5th Cir.1995) (citing cases holding that while Sixth Amendment does not require court to place witness on stand merely to invoke privilege, court has discretion to do so); *United States v. Kinchen,* 729 F.3d 466, 475 (5 th Cir.2013) (holding that district court had discretion to prevent defendant from making witness invoke Fifth Amendment in jury's presence); *United States v. Tush,* 165 Fed.Appx. 742, 744 (11th Cir.2006) (finding no abuse of discretion in district court's refusal to allow defendant to call to stand witness who intended to assert Fifth Amendment privilege to all questions); *People v. Human,* 331 Ill.App.3d 809, 265 Ill.Dec. 642, 773 N.E.2d 4, 13 (2002) (examining whether it was proper for trial court to preclude witness from taking stand for purpose of exercising his fifth amendment privilege against self-incrimination where witness had advised trial court, outside of the presence of jury, that he would claim his fifth amendment privilege if he was called to testify, and explaining that evidentiary rulings are within discretion of trial court); *Gray v. State,* 368 Md. 529, 796 A.2d 697, 714–15 (2002) (recognizing trial courts have discretion to allow witness to invoke privilege against self-incrimination in front of jury); *People v. Thomas,* 51 N.Y.2d 466, 434 N.Y.S.2d 941, 415 N.E.2d 931, 934 (1980) ("[T]he decision whether to permit defense counsel to call a particular witness solely 'to put him to his claim of privilege against self incrimination in the presence of the jury' rests within the sound discretion of the trial court[.]"); *State v. Pickens,* 346 N.C. 628, 488 S.E.2d 162, 168–69 (1997) (finding no abuse of discretion when trial court did not require witness to assert Fifth Amendment in jury's presence).

Had the majority undertaken this more reasoned approach and imbued our trial courts with the discretion to determine whether a witness should be compelled to invoke the privilege against self-incrimination in front of the jury based on the particular facts and circumstances of a given case, I might have been persuaded to agree with such a departure from the general rule and to such an extension of *Whitt.* I cannot, however, agree with the majority's mandate that compels trial courts, without exception, to force non-party witnesses to the witness stand for purposes of invoking the privilege in the jury's presence, particularly given the sound policy reasons undergirding the rule against such a requirement. Several of these laudable policy reasons were identified in *Whitt:*

> Those courts that require the assertion of the privilege outside the jury's presence adhere to this practice as a means of preventing the jury from drawing any improper inferences from the witness' decision to exercise his constitutional privilege. *See Bowles v. U.S.,* 439 F.2d 536, 541 (C.A.D.C. 1970) (recognizing concerns that invocation of Fifth Amendment in jury's presence "will have a disproportionate impact on their deliberations" and identifying principle that guilt may not be inferred from exercise of privilege as underpinning of rule that jury should not draw inferences from witness's decision to exercise constitutional privilege against self-incrimination); *U.S. v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973) (stating that "[n]either side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him").

*Whitt,* 220 W.Va. at 696, 649 S.E.2d at 269.

Through its creation of a blanket requirement compelling a non-party witness to take the witness stand for the purpose of invoking his or her Fifth Amendment privilege in the

jury's presence, the majority has unwisely forgotten the very principles that support the general prohibitory rule. In addition to the potential for the jury to draw a negative inference from a witness's decision to invoke the privilege as discussed in *Whitt*, there is also the potential for the jury to assign some probative value to the refusal to testify, or to speculate about a witness's unwillingness to testify. As the Kansas Supreme Court recently explained,

> a witness's reliance on the Fifth Amendment "may have a disproportionate impact upon the minds of the jurors." [Citation omitted.] "The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the ... fact that *it is a form of evidence not subject to cross-examination.*" [Citation omitted.] Because *the impact of a witness's refusal to testify outweighs its probative value*, "[i]t is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." (Emphasis added.) 232 Kan. at 260, 654 P.2d 417 (quoting *Com. v. Hesketh*, 386 Mass. 153, 157, 434 N.E.2d 1238 [ (1982) ] ).

*State v. Turner*, 333 P.3d 155, 167 (Kan.2014) (quoting *State v. Crumm*, 232 Kan. 254, 654 P.2d 417, 422 (1982)). Similar concerns were voiced by the Appeals Court of Massachusetts:

> Requiring a Commonwealth's witness to assert the privilege in front of the jury could result in severe prejudice to the Commonwealth's case. See *Commonwealth v. Gagnon*, 408 Mass. 185, 198, 557 N.E.2d 728 (1990), *S.C.*, 430 Mass. 348, 718 N.E.2d 1254 (1999) (evidence that witness exercises his Fifth Amendment right "produce[s] no relevant evidence, while inviting the jury to engage in unwarranted and impermissible speculation"); *Commonwealth v. Oliveira*, 74 Mass.App.Ct. 49, 57–

58, 904 N.E.2d 442 (2009) (permitting witness who refuses to testify to assert Fifth Amendment privilege before jury "presents the real possibility that jurors will speculate that the witness is guilty of the crime charged [or another crime] and that the defendant is not").

*Com. v. Viust*, 84 Mass.App.Ct. 308, 995 N.E.2d 1133, 1137 (2013); *see also U.S. v. Branch*, 537 F.3d 328, 342 (4th Cir.2008) (internal citations omitted) (addressing alleged error where district court was aware that defense witness intended to invoke privilege against self-incrimination and concluding that "the district court's evidentiary ruling was not an abuse of discretion. The district court found that placing [witness] on the stand solely to invoke his Fifth Amendment privilege would lead to 'unfair prejudice' in the form of both unwarranted speculation by the jury and the government's inability to cross-examine [witness]. And any inferences that the jury might have drawn from [witness's] privilege assertion would have been only minimally probative—and likely improper—in any event.").

Through its express foreclosure of any discretion to trial courts, the majority grants prosecutors and defense counsel carte blanche to badger witnesses by repeatedly asking questions designed to elicit the invocation of the Fifth Amendment privilege. Neither the defense nor the prosecution should have the right to benefit from any inferences the jury may draw simply from observing a witness assert a valid Fifth Amendment privilege, yet that opportunity has clearly been created by the majority's decision. In an effort to alleviate some small measure of the potential harm created by its new point of law, the majority further holds that "where a non-party witness invokes the constitutional privilege against self-incrimination or otherwise refuses to testify, a party is not entitled to an instruction allowing the jury to infer that the witness's testimony would be favorable or unfavorable to either the defendant or the prosecution."[9] Critical-

---

9. I concur in this new syllabus point to the extent it will not allow such a jury instruction, but I disagree to the extent the majority further holds in syllabus point three that it is overruling *Whitt* to the extent it is inconsistent. Has the majority read *Whitt*? Nowhere in *Whitt* did we say that a party is entitled to such a jury instruction, so precisely what is the majority overruling?

ly, there is nothing in that new point of law that will prevent a jury's natural tendency to unilaterally draw its own inferences, whether favorable or unfavorable to either the defense or the prosecution, after observing a witness's invocation of the Fifth Amendment privilege.

Endeavoring to undervalue the valid concerns that support the general prohibitory rule, including the risk of creating "courtroom drama" through a witness's invocation of the Fifth Amendment privilege, the majority relies upon several cases where we have upheld the evidentiary rulings of trial courts involving matters such as gruesome photographs and suicide notes. In each of these cases, a trial court had exercised its discretion in making evidentiary rulings, after employing balancing tests and making required relevancy determinations. The majority clearly fails to appreciate its conflicted reasoning when it robs trial courts of any discretion—finding the limited discretion we afforded to trial courts under a circumscribed set of circumstances in *Whitt* to be "problematic"—yet hails a series of cases involving evidentiary rulings that inherently require a court's exercise of discretion.

Because the majority is clearly disinclined to adopt a rule of law giving trial courts discretion to determine whether a non-party witness should be compelled to take the witness stand solely to invoke his or her Fifth Amendment, another alternative would have been for the majority to fashion an exception to the general prohibitory rule, as we did in *Whitt*:

> [w]here a defendant in a criminal case seeks to call a witness to the stand who intends to invoke his or her Fifth Amendment privilege against self-incrimination and the defendant has presented sufficient evidence to demonstrate the possible guilt of the witness for the crime the defendant is charged with committing, the trial court has the discretion to compel such witness to invoke his or her Fifth Amendment privilege in the presence of the jury.

10. Under our state constitution, a defendant's compulsory process rights are set forth in article III, section 14.

In making its decision as to whether a witness should be called to the stand for the purpose of invoking his or her Fifth Amendment privilege against self-incrimination, the trial court should consider whether the defendant will be unfairly prejudiced by not allowing the potentially exculpatory witness to invoke this privilege in the jury's presence.

220 W.Va. at 687, 649 S.E.2d at 260, syl. pts. 6 & 7. While the narrow exception formulated in *Whitt* does not apply under the facts of the case *sub judice,* the majority could have crafted another similarly narrow exception where a defendant has presented sufficient evidence to demonstrate the legitimacy of a claim of self-defense and the victim then advises that he or she will plead the Fifth Amendment.

I vehemently disagree with the majority's new rule of law regarding the Fifth Amendment as it radically departs from the general prohibitory rule and wholly lacks support from any other jurisdiction in this country. It is foreseeable that either the prosecution or the defense may strategically offer a witness solely to elicit the invocation of the Fifth Amendment to gain an improper inference. Consequently, I fear that the majority's new point of law has the potential to encourage wrongful manipulation of this state's criminal justice system.

### III. Compulsory Process

The defendant asserts that his Sixth Amendment compulsory process right was violated because the trial court did not allow the jury to observe the physical struggle of endeavoring to have the obstreperous Mr. McGuire enter the courtroom and take the witness stand.[10] I agree with the majority's observation that a criminal defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his or her favor is a "fundamental right." *See Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).[11] However, I strongly disagree

11. The majority has also cited *Washington* for the proposition that "excluding a defense witness from the jury's presence would impinge on this fundamental right for reasons outside the defendant's control." Unlike the case at bar, *Wash-*

with the majority's creation of new law without a new syllabus point by "find[ing] the circuit court's decision not to make McGuire appear in front of the jury was error and violated the Defendant's constitutional right to compulsory process."

A defendant's constitutional right to compulsory process is met once the witness is brought to the courtroom, even when a trial court refuses to allow a witness to be called to the stand solely to invoke his or her Fifth Amendment privilege against self-incrimination in the jury's presence. Moreover, "[t]he calling of a witness who will refuse to testify does not fill the purpose of compulsory process, which is to produce testimony for the defendant. *United States v. Roberts,* 503 F.2d 598, 600 (9th Cir.1974)." *State v. Rollins,* 188 S.W.3d 553, 568 (Tenn.2006) (quoting *State v. Dicks,* 615 S.W.2d 126, 129 (Tenn.1981)). Indeed,

> [t]he Sixth Amendment requires that a witness be brought to court, but it does not require that he take the stand after refusing to testify. Once a witness appears in court and refuses to testify, a defendant's compulsory process rights are exhausted. It is irrelevant whether the witness's refusal is grounded in a valid Fifth Amendment privilege, an invalid privilege, or something else entirely.

*United States v. Griffin,* 66 F.3d 68, 70 (5th Cir.1995) (citation and footnotes omitted); *accord State v. Acker,* 133 Hawai'i 253, 327 P.3d 931, 960 (2014); *see also United States v. Lacouture,* 495 F.2d 1237, 1240 (5th Cir.

1974) (stating that right to compulsory process would be exhausted by subpoenaed witness's physical availability at court); *United States v. Roberts,* 503 F.2d 598, 600 (9th Cir.1974) ("The Sixth Amendment right to call a witness must be considered in the light of its purpose, namely, to produce testimony for the defendant ... Calling a witness who will refuse to testify does not fulfill the purpose[.]"); *Unsell v. Dretke,* No. Civ.A.4:03–CV–254–A, 2003 WL 22328904, *3 (N.D.Tex. Oct. 8, 2003) ("Although the Sixth Amendment requires that a witness be brought to court, it does not require that he take the stand after refusing to testify.") (citing *Griffin,* 66 F.3d 68)); *In re Bizzard,* 559 F.Supp. 507, 510 (S.D.Ga.1983) (holding that right to compulsory process was not denied when trial court declined to enforce subpoena for witness who refused to testify); *Rollins,* 188 S.W.3d 553, 568 (quoting *Roberts,* 503 F.2d 598).

Mr. McGuire was transported to the courtroom from an out-of-state federal prison for the purpose of testifying at the defendant's trial. Although Mr. McGuire physically resisted and refused to take the witness stand; to be sworn; or to testify; the defendant's constitutional compulsory process rights were met once Mr. McGuire was brought to the courtroom.

While the majority undertakes to provide some guidance to trial courts when confronted with a defiant witness, each of the options that it suggests, including use of a two-way-video feed,[12] contempt, or extra bailiffs,[13] necessarily involves a discretionary decision by

*ington* did not involve a witness's refusal to testify. In fact, the Supreme Court stated that "[n]othing in this opinion should be construed as disapproving ... the privilege against self-incrimination[.]" *Washington,* 388 U.S. at 23, n. 21, 87 S.Ct. 1920.

**12.** In footnote 15, the majority cites *State v. Cox,* No. 13–0778, 2014 WL 4930264 (W.Va. Oct. 2, 2014) (Memorandum Decision), wherein we found that the trial court had not abused its discretion when it allowed incarcerated witnesses to testify through a two-way-video-feed where they were determined to be a security threat. That case is inapt as none of the incarcerated witnesses had invoked a Fifth Amendment privilege. Further, the defendant did not argue on appeal that he was denied the right to confront the witnesses against him. *Id.* n. 5.

While two-way-video-conferencing may satisfy a defendant's right to confrontation, I caution against any reliance upon footnote 15 of the majority opinion. The majority cites *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), for the proposition that a defendant's Sixth Amendment right to confrontation may be satisfied where the "reliability of the testimony is otherwise assured." The majority fails to recognize that the test articulated in *Craig* was based on *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which was abrogated by *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**13.** In the case at bar, the trial court actually employed two of the majority's suggested options in its effort to facilitate Mr. McGuire's testimony by holding him in contempt and utilizing extra bailiffs.

the trial court. Yet, in syllabus point two, the majority unwisely removes any discretion from trial courts by mandating that trial courts compel the non-party witness to invoke his or her Fifth Amendment privilege in the jury's presence. It is simply incongruous for the majority to state that it is cognizant of a trial court's "inherent authority to conduct and control matters before it in a fair and orderly fashion[,]" while simultaneously stripping those trial courts of their discretion.

## IV. Conclusion

For the foregoing reasons, I respectfully concur, in part, and dissent, in part, to the majority's decision in this case.